A99A0098. HARRISON v. BECKHAM.
(518 SE2d 435)

SMITH, Judge.

The facts underlying this case have appeared before us in a previous appeal. In *Harrison v. Digital Equip. Corp.*, 219 Ga. App. 464 (465 SE2d 494) (1995) (*Harrison I*), we affirmed the trial court's holding that Brenda Harrison's pro se action against her employer, an architect, and a contractor for damages resulting from "sick building syndrome" was barred by the applicable statute of limitation. Harrison then brought suit against attorney Walter H. Beckham III, alleging that he committed legal malpractice by failing to advise her regarding the applicable statute of limitation in her first action.[1] The trial court granted Beckham's motion for summary judgment on the basis of expiration of the statute of limitation for legal malpractice, and Harrison appeals. Because this statute of limitation also expired

---

[1] Beckham denies that he ever represented Harrison, but for purposes of this appeal we assume the truth of Harrison's allegation.

before Harrison brought suit, we affirm.

1. The statute of limitation on Harrison's claim for legal malpractice began to run when the statute of limitation on her original personal injury claim expired without suit being filed against the defendants. *Plumlee v. Davis*, 221 Ga. App. 848, 851 (1) (473 SE2d 510) (1996). Since this action was filed on September 10, 1996, if Harrison's malpractice cause of action accrued before September 1992 all her claims are barred by the four-year statute of limitation.[2] In turn, if the statute of limitation on Harrison's underlying tort claim expired before September 1990 that claim is likewise barred. We therefore examine the underlying tort action to determine the date on which that earlier statute of limitation began to run.

"The test for determining when the statute of limitation began to run against plaintiffs is not when they were diagnosed with symptoms consistent with . . . poisoning, it is when they *suspected* that their alleged injuries *may have been caused* by [defendants'] conduct. [Cits.]" (Emphasis supplied.) *Thomason v. Gold Kist,* 200 Ga. App. 246, 247 (1) (407 SE2d 472) (1991). While Harrison now insists that she was unsure of the cause of her illness until September 1990 and has filed an affidavit to that effect, her earlier testimony in a workers' compensation claim against her employer directly contradicts this assertion.[3] There, she testified that as soon as she entered the new building on her first day of work in July 1989, she started having a runny nose. During the next six weeks, she began to experience fatigue, tightness in her chest, throat problems, eye irritation, and an inability to concentrate. She also noted that when she left the building for lunch, her symptoms improved. By September 1989, she had experienced flu-like symptoms, pneumonia, and double pneumonia. Dr. Horowitz, the physician who treated her for pneumonia, released her to return to work, but as soon as she returned to work she was "totally unable to breathe" and had to go to the emergency room, where her symptoms quickly subsided. Harrison described this as "a situation . . . that led us to believe that it was a hundred percent the building . . . that's when we figured it back to the building and he sent me, referred me to an allergist." She also stated that Dr. Horowitz "knew something was wrong at that building."

Harrison was not satisfied with the first allergist she consulted, because "by then I was very, very suspicious of the building, and his attitude towards me was he didn't have the belief structure that

---

[2] A malpractice claim sounding in contract is governed by the four-year statute of limitation in OCGA § 9-3-25, while a malpractice claim sounding in tort is governed by the two-year limitation in OCGA § 9-3-33. Id. at 851-852 (2).

[3] But Harrison also concedes in another portion of her brief that "the statute of limitations in the underlying case began to run sometime between 1989 and September of 1990."

aligned with that at all. And so I yanked my medical records and walked out of his office." In January 1990, she consulted another allergist, Dr. Melby. In his initial evaluation of Harrison, Dr. Melby wrote, "Temporally there is a clear relationship between her symptoms and her new work place and I would be very suspicious of the 'sick building syndrome' as being the cause of her deterioration." On April 12, 1990, after Harrison's return to the building caused another relapse, Dr. Melby's progress notes stated: "IMPRESSION: 1. Sick building syndrome with recent exposure. 2. Background of atopy and probable hyperreactive airways. PLAN: 1. Stay out of the building."

According to Harrison, Dr. Melby told her "to get the hell out of that building . . . he felt like the building was lethal for me and he wrote a note to my manager and sent it to my manager telling [them] to get me out of the building and they moved me at that time." A copy of Dr. Melby's letter of May 3, 1990 to Harrison's employer was attached as an exhibit to Harrison's deposition in this case. In this letter, which showed a copy sent to Harrison that she acknowledged receiving, Dr. Melby told the employer that he examined Harrison in January 1990. From that examination, he stated, "It was my conclusion that she had an episode of hyperreactive airways and symptoms compatible with 'sick building syndrome' related to her exposure to your new facility in Alpharetta." He noted that he advised Harrison at that time to stay out of the building. He mentioned her relapse in April upon re-exposure to the building and stated that he "again advised her to stay out of the building since it appeared that her symptoms were clearly related to some exposure there."

In her earlier deposition, Harrison also stated that she believed that the building was causing her problems before she complained to her supervisor in December 1989. In September 1989, Harrison told the company nurse that the new building was causing the problems she was experiencing. According to Harrison, a number of employees were experiencing problems with the new building and complained about it to the nurse, and "[e]verybody seemed to be abnormally sick."

Harrison also wrote memoranda to her employer concerning her problems with the building as early as December 1989. These letters were identified and attached as exhibits to her deposition in this case. In her deposition, Harrison acknowledged writing a December 1989 interoffice memorandum recounting her symptoms in detail, as well as her observation that they were alleviated when she left the building. She noted that "almost everyone you talk to" had experienced similar health problems since moving to the new facility, and concluded by stating, "I would like you to elevate my concerns to the highest levels. I believe my long term health is being jeopardized by this building."

In April 1990, Harrison wrote another memorandum titled "BUILDING SICKNESS" to her supervisor. She reported that she had met with Dr. Melby regarding her most recent six hour visit to the building and her subsequent breathing problems. After discussing the steps her employer already had taken to measure various chemicals in the building, she stated, "According to my doctor, Dr. Kenneth Melby, it does not look like the building has been fixed for me to come back to work." This evidence clearly supports a finding that Harrison suspected that her illness may have been caused by her employer's building as early as September 1989 and certainly no later than April 1990.

2. Harrison attempts to contradict this earlier testimony by an affidavit filed in opposition to Beckham's motion for summary judgment. But the rule regarding the construction of self-contradictory testimony on summary judgment is well established: Unexplained contradictory testimony must be construed against the party providing it. *Prophecy Corp. v. Charles Rossignol, Inc.*, 256 Ga. 27, 28-30 (1) (343 SE2d 680) (1986). The sworn testimony of a personal injury litigant in an earlier workers' compensation action is subject to the *Prophecy Corp.* rule. *Hudgens v. Broomberg*, 262 Ga. 271-272 (416 SE2d 287) (1992). "Whether such testimony is contradictory, and whether a reasonable explanation has been offered is a question of law for the trial court. [Cits.]" *Worley v. State Farm &c. Ins. Co.*, 208 Ga. App. 805, 807 (432 SE2d 244) (1993).

Harrison's contention that testimony from her earlier deposition constituted "unsworn, extrajudicial, and erroneous statements taken from an alleged deposition supposedly taken in another case" is so wholly without merit as to border on the frivolous. The record in this case shows conclusively that this contention is not only meritless but also totally false. Harrison testified extensively under oath in this litigation regarding her workers' compensation claim and her earlier testimony. More importantly, her present counsel stipulated on the record in this case to the certified transcript of the workers' compensation deposition, and he marked and introduced it as an exhibit to the deposition of a witness in this case.

In her affidavit, Harrison avers that she attended a "special clinic" two months before she gave her deposition in the workers' compensation case and "learned a great deal about my illness which caused me to reflect differently in hindsight." In her second deposition, Harrison offered as a general explanation for the changes in her testimony that "what I know in retrospect is definitely tainting my knowledge of the situation. What I know now is definitely tainting what I know happened." In response to questioning about her statement in the earlier deposition that "we had a situation happen that led us to believe that it was 100% the building," she stated she did

not remember "who I was thinking of in terms of 'we' specifically for sure at that time," that the deposition was taken "almost a year and a half after the time frame," and she would "tend — I can sometimes give an effusive answer and not be very clear. And I don't know at that point what I was answering, I mean, in terms of my recollection today."

These broad and confusing statements do not constitute a reasonable explanation within the meaning of *Prophecy Corp.* It appears that Harrison is claiming a generally unclear state of mind or memory, or claiming that her testimony was "effusive" or exaggerated rather than accurate, perhaps due to nervousness or simply her habit of speech. But a general state of nervousness or confusion "generally will not constitute a reasonable explanation of any self-contradictory statements allegedly arising therefrom. To accept such an explanation as being reasonable would totally erode the *Prophecy Corp.* rule; we decline to promote such an erosion." *Hallberg v. Flat Creek Animal Clinic*, 225 Ga. App. 212, 214 (483 SE2d 671) (1997).

If the attendance at the "special clinic" had occurred *between* Harrison's original testimony and her later deposition in this case, and it had caused her to rethink her earlier testimony in light of additional knowledge she gained at the clinic, such knowledge might constitute a reasonable explanation for the change in her testimony. But Harrison attended the clinic before she gave either deposition, and no evidence shows that her knowledge underwent any relevant change between her two depositions. The only change was in the legal consequences of her testimony in the second cause of action.

More importantly, her assertion does not explain why she testified originally that, as early as September 1989, her physician "knew something was wrong at that building," that she was "very, very suspicious of the building," and that she "figured" or "believed" that her illness was "one hundred percent the building," if she did not gain that knowledge until September or October 1991. It also does not explain her conduct in late 1989 or early 1990 in "yank[ing] [my] medical records and walking out of [the] office" of an allergist who did not accept her conclusion that the building was the cause of her illness. Nor does it explain her contemporaneous memoranda attributing her illness to her employer's building, or her physician's clinical notes or his letter to her employer in May 1990. Even in her second deposition, Harrison acknowledged that her physician had advised her to stay out of the building in January and again in April 1990, and that she "believed it was a possibility at that time" that her symptoms were related to exposure to the building.

When her self-contradictory testimony is construed against her, it is clear that Harrison was "suspicious" that her illness "may have been caused," *Thomason*, supra, by her employer's building when she

declined the services of the first allergist she consulted because she was "very, very suspicious of the building" and he did not agree. "Plaintiff's cause of action accrued when, in the exercise of reasonable diligence, she discovered or should have discovered that she had been injured and that her injury *may have been caused* by defendants' conduct. [Cit.]" (Emphasis supplied.) *Harrison I*, supra at 465. Dr. Melby filed a second affidavit with Harrison's brief in opposition to Beckham's motion,[4] in which he asserts that despite his clinical notes he had only been "speculating" that Harrison's symptoms were "compatible with 'sick building syndrome' " and "did not give a diagnosis of her condition." But this affidavit creates no issue of fact. "A specific and accurate diagnosis of plaintiff's affliction was not necessary to begin the running of the statute of limitation. [Cits.]" Id. The absence of positive test results on the presence of chemicals in her employer's building likewise has no effect on the commencement of the period of limitation.

It is apparent from Harrison's testimony, her correspondence, and Dr. Melby's clinical notes and correspondence that she was fully aware of the causal connection between her employer's building and her illness at least by May 1990, even though the exact medical and chemical details of that connection were not yet known.

3. Harrison's contention that her exposure to the building constituted a continuing tort and tolled the statute of limitation is without merit. "Georgia courts have consistently held that in a continuing tort a cause of action accrues when a plaintiff discovers, or with reasonable diligence should have discovered, both the injury and the cause thereof." (Citations and punctuation omitted.) *Waters v. Rosenbloom*, 268 Ga. 482, 483 (2) (490 SE2d 73) (1997). And Harrison's assertion that Beckham's alleged erroneous advice "may well have constituted fraud" is foreclosed by the Supreme Court of Georgia's recent decision in *Hunter, Maclean, Exley & Dunn, P.C. v. Frame*, 269 Ga. 844 (507 SE2d 411) (1998). "[W]here the gravamen of the underlying action is not a claim of fraud, but rather of malpractice, the statute of limitations is tolled only upon a showing of a separate independent actual fraud involving moral turpitude which deters a plaintiff from filing suit." (Citation, punctuation, and footnote omitted.) Id. at 847 (1). Even in the context of a confidential relationship, a showing of actual fraud, including intention to conceal or deceive and deterrence from bringing suit, is required. Id. at 849.

Harrison speculates that Beckham may have learned of his mis-

---

[4] Dr. Melby had provided an earlier affidavit for Beckham's motion for summary judgment, in which he stated that he evaluated Harrison in January and April 1990, concluded she suffered from symptoms compatible with "sick building syndrome," and advised her to stay out of the building.

take during his alleged representation and continued to advise Harrison that the statute of limitation was not a problem, and that this "may well have constituted" a tolling fraud. But this speculation is unsupported by any citation to the record. Harrison has failed to plead fraud with particularity, as required by OCGA § 9-11-9. *Moore v. Bank of Fitzgerald*, 225 Ga. App. 122, 127, n. 3 (483 SE2d 135) (1997).

*Deans v. Dain Mgmt.*, 201 Ga. App. 466 (411 SE2d 354) (1991), cited by Harrison, is inapposite here. In *Deans*, the plaintiff suffered from a persistent sensitivity to formaldehyde caused by earlier exposure in a different workplace to a product manufactured and sold by the defendants. We held that while the plaintiff may have believed that something in the workplace was causing her health problems in 1986, she "neither knew, nor through the exercise of reasonable diligence should have known, that her symptoms were the result of having been sensitized to formaldehyde between 1984 and 1985." Id. at 470 (2). In contrast, no issue of hypersensitivity in one workplace caused by earlier overexposure at another is presented here. Harrison almost immediately experienced illness and discomfort upon moving to her employer's new building, and those symptoms consistently abated when she left the building. These observations were reported contemporaneously by Harrison to her employer in memoranda attributing her symptoms to the building; they were further supported by her doctor's clinical notes and letters in which he reached the same conclusion. Harrison has presented no evidence of any alternative cause for her illness.

While Harrison insists that this court's holding in *Harrison I*, supra, forecloses a finding of her knowledge of the underlying tort claim earlier than September 1990, that issue was not presented or decided in *Harrison I*. Harrison's underlying tort action against her employer was filed in May 1994, and this court in the earlier appeal determined only that the applicable two-year statute of limitation had commenced to run before May 1992. *Harrison I*, supra at 465. "[T]he filing of a workers' compensation claim in September 1990 shows that *by that date* plaintiff had knowledge that the new building may have been a cause of her injuries." (Emphasis supplied.) Id. Whether Harrison had knowledge in May or January 1990 or even in December 1989 was irrelevant to the determination in *Harrison I* that the statute had commenced to run at least by September 1990 and in any event before May 1992. That holding does not foreclose a later determination from the evidence that Harrison had knowledge before September 1990.

The trial court correctly granted summary judgment on the basis of expiration of the relevant statute of limitation.

*Judgment affirmed. Pope, P. J., and Eldridge, J., concur.*

■■■■■■■■■■■■■■■

DECIDED MAY 24, 1999 — CERT. APPLIED FOR.

■■■■■■■■■■■■■■■■■■■■■■■■

*B. Louise Bugg, Mike Bothwell*, for appellant.
*Troutman Sanders, Robert L. Pennington, Daniel S. Reinhardt, Tracy M. Nelson*, for appellee.